FILED
2012 Sep-27  PM 03:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **SUSAN M. DENNEY**, | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION NO. 1:11-CV-2099-KOB** |
| | ) |
| **MICHAEL J. ASTRUE**, | ) |
| **Commissioner of the Social**, | ) |
| **Security Administration** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

## I. INTRODUCTION

On January 14, 2009, the claimant, Susan M. Denney, applied for period of disability, disability insurance benefits under Title II of the Social Security Act and supplemental security income under Title XVI of the Social Security Act.  The claimant alleges disability commencing on October 31, 2008, because of migraine headaches.  (R. 62-63).  The commissioner denied the claims. (R. 67-77). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a video hearing on December 2, 2010. (R. 34-61). In a decision dated December 3, 2010, the ALJ found that the claimant was not disabled as defined in the Social Security Act.  Thus, the claimant had not been under a disability and was ineligible for disability insurance benefits and supplemental security income.  (R. 13-20).  The Appeals Council denied the claimant's request for review on May 27, 2011. (R. 1).  The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court affirms the decision of the

Commissioner.

## II. ISSUES PRESENTED

The issue presented is whether the ALJ properly considered the medical evidence of record by failing to give controlling weight to the treating physician's opinion in applying the Eleventh Circuit's three-part pain standard.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record that support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986). The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings." *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To make this determination the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[1]

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising form that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529.

In considering the medical evidence of record, the Commissioner must give the testimony of a treating physician "substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause is shown

---

[1]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981)(Unit A).

"where the doctor's opinion is not bolstered by the evidence, . . .where the evidence supported a contrary finding," or where "the doctor's opinions were conclusory or inconsistent with their own medical records." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

## V. FACTS

The claimant was twenty-four years old at the time of the administrative hearing and has a high school education. (R. 20, 121, 172). Her past work experience includes employment as a cashier, assistant manager of a convenience store, laborer, and sales person. The claimant testified that she has not engaged in substantial gainful activity since October 31, 2008. (R. 44-6). The claimant alleged that she is unable to work because of episodic migraine headaches that cause pain, blurry vision, upset stomach, and sensitivity to light and sound, and because of pain in the lower back and left hip. (R. 50, 54).

*Physical and Mental Limitations*

The claimant testified that in October 2008, while working as a cashier at Walmart, she suffered a possible stroke. The claimant testified that she did not have insurance at the time so it was not possible for a doctor to perform proper tests to determine the cause of the episode. (R. 44, 46).

On February 11, 2008, the claimant was admitted to the Citizens Baptist Medical Center Emergency Room after a suicide attempt. The record indicates that the claimant intentionally overdosed on Cipro and Hydrocodone because of depression and situational problems. (R. 298). The claimant was released after agreeing to follow up treatment at the Cheaha Mental Health Center.  (R. 302). The record shows no evidence of the claimant seeking follow up treatment at the mental health center.

4

On October 29, 2008, the claimant was again admitted to the Citizens Baptist Medical Center Emergency Room. The claimant complained of a headache, dizziness, lightheadedness, blurred vision, nausea, and fainting. (R. 288). The doctor performed a brain CT and an EKG, both of which he interpreted as normal. (R. 277). The doctor diagnosed a urinary tract infection due to dehydration and prescribed the claimant Cipro.  (R. 288, 275).

On November 11, 2008, Dr. Chandra Gehi, a neurologist at Anniston Neurology, examined the claimant. The claimant explained her history of syncope and complained of weakness in her left leg. Dr. Gehi performed a neurological exam, and the results of the exam were normal. The claimant agreed to continue therapy for a few more days to see if it helped her left leg, and Dr. Gehi gave the claimant a note excusing her from work for the next two weeks. (R. 288, 275)*.*  Dr. Gehi asked the claimant to return for another appointment in two weeks, but the claimant canceled the appointment and never returned to Dr. Gehi. (R. 265-9).

On February 3, 2009, the claimant was admitted to the Clay County Hospital Emergency Room.  She complained of a left side headache. After a physical examination, the Emergency Room doctor recorded his impression of an acute, severe, migraine headache. The claimant received medication in the form of Toradol, Reglan, and Lortab. (R. 234-7).

On February 20, 2009, Dr. Fazal Rahim, a treating physician and neurologist, examined the claimant on referral from the claimant's primary care physician, Dr. Charles Hensleigh. The claimant complained of episodic headaches, insomnia, a fainting spell, and weakness in her lower extremities. Dr. Rahim performed a neurological examination and concluded that the claimant had no clear abnormalities other than reduced reflexes on the right side.  Dr. Rahim concluded that the claimant's headaches were consistent with migraine headaches and prescribed

the claimant Topomax and Elavil.  Dr. Rahim ordered an MRI of claimant's brain to address her complaints of left side weakness, although he noted that the descriptions of her symptoms and the way they improved "raise suspicion for conversion type reaction."  (R. 224-6).  Dr. Rahim ordered a MRI that was performed on February 27, 2009, and the results showed no significant findings within the brain. (R. 231).

On March 18, 2009, Brad Stanley, the state agency adjudicator, performed a physical RFC assessment on the claimant.  Mr. Stanley's assessment indicated that the claimant could do the following: occasionally lift fifty pounds; frequently lift twenty five pounds; stand and/or walk with normal breaks for a total of about six hours in an eight hour work day; push and/or pull with no limitations; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; and balance, stoop, kneel, crouch, and crawl with no limitations.  (R. 243-250).

Dr. Robert Estock, the state agency psychiatrist, completed a psychiatric review technique on the claimant on March 23, 2012.  Dr. Estock's assessment  indicated that the claimant suffered from no severe mental impairment.  In the "Consultant Notes" in section IV. of the PRT, Dr. Estock noted that the other than the claimant's February 2008 overdose, the claimant had no history of mental health treatment or suicide attempts prior to that time.  In addition, Dr. Estock noted that during subsequent medical evaluations by various doctors, the claimant indicated no problems with depression.  (R. 251-264).

The claimant visited Dr. Rahim again on April, 3, 2009. The claimant indicated that she thought the medicine was helping to fight her migraines and that she was experiencing fewer headaches.  During this visit, Dr. Rahim found the claimant's cranial nerves, motor system, plantar responses, sensory, cerebellar function, gait, speech, and language to all be normal.  (R.

6

221).

At this time, the claimant also complained of pain in her lower back and left hip that radiates to her left knee.  Dr. Rahim increased the claimant's prescription for Topomax and continued her prescription for Elavil and Maxalt for her headaches.   Dr. Rahim ordered an MRI of the lumbosacral spine to evaluate the pain in her lower back and left leg. (R. 221-223).  The MRI, performed on April 13, 2009, was negative except for mild lower lumbar degenerative change.  (R. 230).

The record contains headache logs prepared by the claimant from April 2009 through February 21, 2010.  The claimant wrote the logs in her handwriting and indicated the date, time, severity, duration and symptoms of her headaches.  (R. 198-202).

On July 6, 2009, Dr. Rahim completed a residual functional capacity questionnaire about the claimant and her limitations.  Dr. Rahim noted that the claimant could walk ten city blocks without rest, continuously sit for more than two hours, stand for one hour, lift twenty pounds occasionally, and would need two fifteen to twenty minute breaks during an eight hour workday. (R. 215, 217).

On July 31, 2009, Dr. Rahim examined the claimant at a follow up visit. The claimant complained of another syncopal episode. Dr. Rahim concluded that the claimant's migraines were "stable" and continued her on Topomax, Zanaflex, and Maxalt.  (R. 211-213).  Dr. Rahim ordered an EEG and scheduled claimant for a sleep study.  On July 31, 2009, Dr. Rahim noted that the claimant was "alert, awake, cooperative, and in no obvious distress."  (R. 212).

The claimant also followed up with her primary care physican during this period on July 30, 2009.  The claimant's primary care physician, Dr. Hensleigh, noted that the claimant's exam

results were normal.  (R. 204-07).

On August 4, 2009, the claimant participated in a sleep study at Clay County Hospital. Dr. Rohit Patel, a sleep medicine specialist, diagnosed the claimant with obstructive sleep apnea and recommended the use of a CPAP machine for treatment. (R. 209).

On March 13, 2010, the claimant was admitted to the Clay County Hospital Emergency Room, complaining of lower back pain.  (R. 311).  Dr. Warren, the emergency room doctor, ordered a CT scan of the abdomen and pelvis, and Dr. Todd Brightbill, a radiologist, interpreted the scan as normal.  (R. 316).  Dr. Warren prescribed the claimant Flexeril and Lortab and told her to seek follow up care from her primary care physician if her symptoms persisted for more than forty-eight hours.  (R. 321).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance and supplemental security income benefits, the claimant requested a hearing before an ALJ. (R. 27). On December 2, 2010, an ALJ conducted a hearing on behalf of the claimant. (R. 34-61). At the hearing, the claimant testified that she takes Topomax, Amitriptyline, and Maxalt for her headaches. The claimant testified that the medications decrease the amount of migraines she has and reduce the intensity "a little," but the medications have not stopped the migraines completely. The claimant testified that with the medication, she has six or seven headaches a month. The claimant testified that her headaches last anywhere from four hours to the entire day. (R. 47-48).

The claimant testified that during 2010, up until the hearing, she had not seen a doctor other than when she went to the emergency room. The claimant testified that she had not seen Dr.

Rahim, her treating physician and neurologist, in more than a year because she is over the limit for doctor's visits that Medicaid allows, and she cannot afford to pay him. The claimant testified that she still takes the same medications that Dr. Rahim prescribed her. (R. 48).

The claimant testified that she lives at home with her six-year-old son, and she routinely gets her son ready for school, does laundry and cleans, helps her son with his homework, goes grocery shopping, and has a valid driver's license. (R. 49). The claimant testified that when she experiences a headache while her son is present, she sits on the couch with him until it is over. (R. 50).

The claimant testified that she has "a lot of pain" in her lower back and left hip. She says that two to three times a month her left leg locks up, and she has to drag her leg. (R. 50-51).

The claimant testified that her current weight, at the time of the hearing, was 337 and a half pounds. The claimant testified that she has cut back on how much she eats and has tried to exercise. (R. 51).

The claimant testified that she can sit in one position for about twenty minutes before she has to change positions. She testified that she spends two hours a day sitting and three and a half hours a day standing and that she could walk for twenty to twenty-five minutes without stopping. The claimant stated that she is able to lift and carry household objects and has no limitations in the use of her hands or feet. The claimant testified that she could climb stairs if she had a rail to hold onto, although it would take a long time, and she might have to pause. The claimant testified that she has not had anymore fainting spells since the second documented spell. (R. 51-53).

When the claimant's attorney questioned her, she claimed that she has severe headaches even while taking Maxalt. The claimant testified that the headaches feel like "somebody is

9

stabbing [her] in the head." The claimant testified that the other symptoms of her headaches include blurry vision, upset stomach, and sensitivity to light and sound. Additionally, the claimant claimed that when she has these headaches she cannot see straight, and moving causes her pain. The claimant testified that she could not go grocery shopping, drive a car, or write bills while she was having a headache. (R. 54)

The claimant testified that she is no longer taking her medication because she ran out of money. (R. 55)

A vocational expert, Dr. William Green, testified concerning the type and availability of jobs that the claimant was able to perform. (R. 56-59). Dr. Green classified the claimant's previous work at Walmart as unskilled with a light exertion level. The ALJ asked Dr. Green a hypothetical based on Dr. Rahim's residual functional capacity report. The ALJ asked whether a 22 year-old with a high school education, work history as a cashier, and the claimant's medically documented impairments could perform the claimant's past work with the following limitations: sit continuously at one time for two hours; stand continuously at one time for one hour; sit a total for four hours in an eight-hour day; stand and walk less than two hours total in an eight-hour day; have the capacity to sit and stand at will; take one to two unscheduled breaks for every eight-hour work period; lift and carry up to 20 pounds occasionally; avoid concentrated exposure to extreme temperatures; and avoid moderate exposure to fumes. Dr. Green testified that such an individual could not be expected to perform any of the past work, and the individual could also not perform any other full-time work in the economy. (R. 56-57).

Then, based on the report from Mr. Stanley, the state agency adjudicator, the ALJ asked Dr. Green whether a 22-year-old with a high school education and a history of light and unskilled

work could perform the claimant's past work with the following limitations: lift, carry, push and pull fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk with normal breaks for six hours total in an eight-hour work day; sit with normal breaks about six hours in an eight-hour day; occasionally climb ramps and stairs but not climb ladders, ropes, or scaffolds; and avoid all exposure to unprotected heights, professional traveling, dangerous machinery, or large bodies of water. Dr. Green testified that such an individual could perform work as a cashier. However, Dr. Green testified that being absent from work for more than two working days a month would eliminate available work. (R. 57-58).

Next, the claimant's attorney questioned Dr. Green.  When questioned by the claimant's attorney about absenteeism, Dr. Green testified that being absent one day per month is tolerated in unskilled work.  When questioned about the ALJ's first hypothetical, Dr. Green testified that being unable to complete an eight-hour work day and requiring two, fifteen to twenty minute unscheduled work breaks were the primary reasons for his response that past work or full time work would not be available.  (R. 58-59).

*The ALJ's Decision*

On December 3, 2010, the ALJ issued a decision finding the claimant was not disabled within the meaning of the Social Security Act from October 31, 2008 through the date of the decision. (R. 13). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through June 30, 2010. Second, the ALJ found the claimant had not engaged in substantial gainful activity since October 31, 2008. (R. 15)

Third, the ALJ found the claimant's migraine headaches and morbid obesity qualified as severe impairments.  The ALJ noted the claimant's depression; however, he concluded that the

11

depression did not qualify as a severe impairment because the claimant was not limited in the four functional areas set out in the disability regulations for evaluating mental disorders. (R. 15-16).

Fourth, the ALJ concluded that the severe impairments did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. To support his findings, the ALJ noted that although the claimant had been diagnosed with migraine headaches, all neurological evaluations and reflex, sensory, and motor exams were normal except for slightly diminished reflexes in the right lower extremity attributed to obesity. The ALJ noted that the frequency and severity of the migraines were documented only by her headache diaries, and the claimant told her neurologist that medications reduced the frequency and severity of her headaches. (R. 17).

Fifth, the ALJ found the claimant had the residual functional capacity to perform light work except that the claimant must avoid climbing ladders, ropes, and scaffolds; cannot work at unprotected heights; cannot do commercial driving; cannot be exposed to dangerous machinery in the workplace; or work on or around large bodies of water.   He also concluded the claimant's obesity would limit her to no more than light exertion. (R. 17).

To support his conclusion, the ALJ followed a two-step process to evaluate the claimant's symptoms.  First, the ALJ found that the claimant's medically determinable physical impairment *could not* reasonably be expected to produce the claimant's pain or other symptoms at the severity claimed by her.  Second, the ALJ decided that the claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the residual functional capacity assessment.  The ALJ concluded that "the

treatment records, the paucity of ER visits, prescription records, her description of daily activities, her being the sole care giver for her six year old son, and the lack of treatment or prescriptions in the last seven months do not support headaches of the frequency and severity alleged or recorded in the claimant's headache diaries." (R. 19).

The ALJ decided that Dr. Rahim's opinion was not supported by his own treatment records, the results of objective imaging studies, his own observed clinical signs and symptoms, or other treatment records. The ALJ noted that Dr. Rahim's opinion was consistent with the claimant's subjective complaints; however, the subjective complaints were not corroborated by the "signs observed by Dr. Rahim or other physicians or other objective medical evidence including neurological evaluation, imaging studies, and pharmacy records." (R. 19).

The ALJ also relied on the opinion evidence of Dr. Estock, the state agency psychiatrist. Dr. Estock found that the claimant suffered from no severe mental impairment.  The ALJ concluded that the entire medical record supported Dr. Estock's PRT assessment.  (R. 19).

Finally, relying on his evaluation of the claimant's residual functional capacity, the ALJ concluded that the claimant was capable of performing past relevant work as a cashier. To support his conclusion, the ALJ relied on the vocational expert's testimony.  The vocational expert testified, in response to the ALJ's hypothetical based on the residual functional capacity assessment performed by Mr. Stanley, that "none of the non-exertional, impairment caused limitations would preclude the performance of claimant's work as a cashier either as she performed it or as it is generally performed." (R. 19).

Based on the opinion evidence of Dr. Estock, the finding that Dr. Rahim's medical opinion was not supported by his own treatment records or observations, and the testimony from

the vocational expert, the ALJ found that the claimant had not been under a disability, as defined in the Social Security Act, from October 31, 2008, through the date of the ALJ's decision. (R. 15-20).

## VI. DISCUSSION

The claimant contends that the ALJ improperly considered the medical evidence of record by failing to give controlling weight to the opinion of the claimant's treating physician, Dr. Rahim, when applying the Eleventh Circuit's three-part pain standard. The court finds that the ALJ sufficiently qualified his evaluation of Dr. Rahim's opinion in light of the substantial evidence to the contrary. As such, the court further finds that the ALJ properly applied the three-part pain standard.

The three-part pain standard applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms. *Holt v. Sullivan*, 921 F.2d 1219, 1223 (11th Cir. 1991). The pain standard requires "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition; or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id.*

In applying the pain standard and determining whether objective medical evidence supports the claimant's otherwise subjective testimony, the ALJ is compelled to give substantial weight to the opinion of the claimant's treating physician. *Crawford v. Comm'r*, 363 F.3d 1155, 1159 (11th Cir. 2004). More specifically, the Commissioner must give the testimony of a treating physician "substantial or considerable weight *unless* 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (emphasis added). Courts

14

have identified "good cause" to disregard the opinions of treating physicians when such opinions were "not bolstered by the evidence, or where the evidence supported a contrary finding." *Id.* Likewise, courts have found "good cause" when the treating physicians' opinions were "conclusory or inconsistent with their own medical records." *Id.*

In finding that the claimant's migraines could not reasonably be expected to produce the claimant's subjective reports of pain and subsequent limitations, the ALJ relied on the claimant's lack of credibility and the objective medical evidence in the record, including Dr. Rahim's *records*.   The ALJ, however, chose not to give controlling weight to the *opinion* of Dr. Rahim, the claimant's treating physician.  The claimant contends that the ALJ improperly dismissed the opinion of Dr. Rahim, who found the claimant to have multiple limitations that would prevent her from sustaining competitive employment.  The claimant argues that by dismissing the opinion of the claimant's treating physician, the ALJ failed to follow the treating physician rule, and thus, his decision on the claimant's disability and RFC was unfounded.

Although Dr. Rahim's opinion was consistent with the claimant's subjective complaints, his opinion was inconsistent with the entirety of the objective medical evidence on record, which includes Dr. Rahim's *own* treatment records, various imagining reports, and evaluations of other physicians.  As a result of this inconsistency, the ALJ relied on the "good cause" exception to the treating physician rule when he declined to give Dr. Rahim's controlling weight and determined that the claimant was not disabled.

First, the ALJ found that Dr. Rahim's treatment records do not support his opinion on the claimant's limitations and her ability to work.  Dr. Rahim's answers to the residual functional capacity questionnaire on July 6, 2009 indicated that the claimant was only able to stand and

walk for less than two hours and sit for about four hours during an eight hour work day and would need one to two unscheduled breaks for fifteen or twenty minutes during the work day. In contrast to Dr. Rahim's answers to the questionnaire, the ALJ pointed to Dr. Rahim's *own* treatment notes regarding a neurological exam of the claimant on February 20, 2009 that reflected no clear abnormalities with the claimant's neurological system. The ALJ additionally explained that Dr. Rahim determined that the claimant's complaints of left-side weakness in her legs might be the result of a conversion type reaction based on the suspicious way her symptoms quickly resolved.

Also contrary to the questionnaire responses, Dr. Rahim's treatment records from April 3, 2009 show that the claimant thought her migraines were improving and that Dr. Rahim found the headaches had improved with the prescribed medications. Additionally, Dr. Rahim recorded that the claimant's cranial nerves, motor system, plantar responses, sensory, cerebellar function, gait, speech and language were all normal. On July 6, 2009, Dr. Rahim indicated that the claimant's headaches were "stable," and the claimant was "alert, awake, cooperative, and in no obvious distress." Therefore, the ALJ correctly determined that Dr. Rahim's opinion was indeed inconsistent with his own treatment notes.

In addition to relying on Dr. Rahim's own treatment notes, the ALJ also relied on objective MRI and CT findings to show that Dr. Rahim's RFC assessment is inconsistent with and unsupported by the evidence in the record. The ALJ explained that Dr. Rahim ordered an MRI of the claimant in February 2009, and the results showed "no significant findings" within the brain. Dr. Rahim ordered another MRI in April 2009 that showed only "mild lower lumbar degenerative change" in the claimant's spine. The ALJ also noted that while in the emergency

room in October 2008, the claimant underwent a CT scan that revealed no acute intracranial abnormalities in her brain, and the claimant's EKG was normal.   Further reasoning that Dr. Rahim's RFC determination was inconsistent with and unsupported by the substantial evidence in the record, the ALJ considered a CT scan from the claimant's March 2010 emergency room visit.  While the claimant complained of low back pain, her CT scan revealed no abnormalities with her pelvis.  (R. 18). The ALJ correctly determined that Dr. Rahim's opinion was inconsistent with the objective medical imaging records.

The ALJ also relied on other available treatment records to highlight that Dr. Rahim's RFC assessment was unsupported by and inconsistent with the other evidence on record.  The ALJ noted the claimant's treatment with Dr. Hensleigh, her original primary care physician. During an exam in 2009, Dr. Hensleigh found the claimant's exam result to be normal.   The ALJ noted that before the claimant saw Dr. Rahim, Dr. Gehi evaluated her on November 11, 2008. Although the claimant had subjective complaints of pain and weakness, the neurological exam results were completely normal.  Dr. Gehi excused the claimant from work for two weeks; however, the claimant never returned to Dr. Gehi for subsequent treatment.  (R. 18).

The ALJ also noted that the claimant's own actions do not support the RFC assessment made by Dr. Rahim and the alleged severity and intensity of the claimant's migraines.  First, the ALJ focused on the fact that the claimant testified that she had seen neither Dr. Rahim nor any other physician for her pain in more than a year.  Second, the ALJ noted the claimant's own testimony that she is able to get her son ready for school; do laundry and cleaning; go grocery shopping; help her son with his homework; prepare dinner; and bathe her son.  The ALJ correctly found that the claimant's ability to perform these daily functions are inconsistent with her alleged

limiting effects of her pain.

This court finds that because Dr. Rahim's opinion was inconsistent with substantial evidence in the record and with his *own* treatment notes, the ALJ had good cause to refuse to give controlling weight to Dr. Rahim's opinion. Also, in relying on Dr. Estock's opinion, the ALJ correctly found that the claimant did not suffer from a severe mental impairment. The court also finds that the ALJ properly applied the three-part pain standard, and substantial evidence supports his decision in this case.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED.

The court will enter a separate order in accordance with this Memorandum Opinion.

DONE and ORDERED this 27th day of September, 2012.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

18